Our final case this morning is 23-1190 Spagnolia v. Charter Communications. Mr. Shaw. Thank you, your honors, and may it please the court, Stephen Shaw for Heather Spagnolia. Excuse me. Heather Spagnolia lost her job due to her need to feed her baby. This case does not only concern Ms. Spagnolia's rights, but also those of nursing mothers in the workplace across Colorado. This case has two major parts. A novel question of state law, the interpretation of the Pregnant Workers Fairness Act, and the merits of Ms. Spagnolia's retaliation claim under McDonnell Douglas. As we've argued in our request to certify to the Colorado Supreme Court, we believe that the first question is more appropriately resolved by the Colorado Supreme Court as a novel question of state law. Did you ask for the certification below? We did not, your honor. And, excuse me, I understand that not requesting certification at the district court does weigh against the analysis. However, it's not fatal. Lane v. Progressive Northern Insurance was one case where certification was granted, even though it was not requested in the district court. And further, you know, I think it's important to think about you don't want to incentivize plaintiffs to, or, you know, losing parties to request certification as a second bite of the apple. That makes sense. But we also don't want to encourage parties to request certification on literally any novel question of state law that arises in the course of litigation. If you look at the summary judgment briefing in this case, the WAMA preemption question was a very small part of a very large summary judgment motion. And given that it was an argument that had never been raised anywhere before to my knowledge, it would make sense not to request the delay of this entire case, you know, this sprawling summary judgment motion, to answer a question that is likely kind of a throwaway moonshot statutory argument. So while it does weigh against the question of certifying, it's not dispositive. And this court can use its discretion to send this novel question of state law to the progress report. So in order for the certification to have a good chance of getting accepted, right, it has to be dispositive. Isn't the question to be certified has to decide the case, has to have a meaningful role in deciding the issue before us? So the rule, the Colorado rule is maybe dispositive. And it makes sense that the rule shouldn't be, must be dispositive whichever way it comes out. Because in that case, it would only be appropriate to certify if it was the only question in the case. So here, I guess what I'm wondering is, to skip ahead to where I'm concerned about is pretext, is that even if you prevail in the Colorado Supreme Court or here that, you know, Magistrate Judge Mix erred, how do you establish, how do you get through pretext here in your client's favor? Well, we can, yes, let's, let, we can move to pretext. I'd like to say first that regardless, regardless of how the McDonnell Douglas question comes out, the statutory interpretation is, or maybe dispositive if it's decided against us by the Colorado Supreme Court. But with regards to pretext, I think the important thing here is to look at the broad course of the interactions between Ms. Magnolia and her employers. You know, I think a relevant jumping in point is when she was, when her, when her supervisors felt that she was pumping too much, and then they spoke with each other about this, that they felt she was pumping too much, it was excessive. And then they decided to change their policy from providing pay breaks for pumping to changing it to unpaid breaks, specifically to discourage her from pumping as much. They said, you know, we think that this will, that changing the pay will fix this problem. That's, that's the first indication that Charter was happy to use this address problem that it was having with Ms. Magnolia. Once we get to the actual, you know, recording that was the proposed legitimate non-discriminatory reason for the termination, I think first, you know, they've been having these problems with Ms. Magnolia. She was an inconvenient employee. She was requesting accommodations. She was rejecting the And then they found that she was recording this meeting. And they, all of a sudden, they had a reason to get rid of her. They've been emailing with each other, her supervisors, about how they needed to fix problems they were having with her. And now they have a reason. She was recording. That's against company policy. Except maybe it's not, because Charter has never actually produced a company policy against recording. Did Charter need to do that? Or was the policy on ethical behavior in the workplace sufficient? Charter was not required to have a policy specifically against recording in order to terminate Ms. Magnolia. However, they moved forward with the termination, believing they had that policy. They based it on that policy. Their initial corrective action report cited a secret recording policy that she violated as the reason for her termination. When they looked, they found that that policy did not actually exist. Audrey Corls emailed other HR representatives to say, you know, where is this policy? No one can find it. They eventually produced an email that was sent to just HR representatives, not employees, not in the code of conduct, saying that, you know, they don't allow recording in the workplace. That was not available to anyone. It's not that they didn't have a policy. It's that once the policy they were relying on was shown not to exist, they then decided to charge through. And I think the other, you know, really relevant evidence on pretext is the case of LK, the other comparator employee. And this is the person who was, approximately a year before, was recording another employee in the workplace who was sleeping. Now, looking at the record, it appears that he was openly recording this employee. This employee was sleeping on the floor. LK was openly recording it. But when he was confronted by Charter, he refused to admit that he was recording. Now, Charter has taken the position that Ms. Magnolia's was more egregious than LK's. First, because she was recording in secret, whereas he was recording openly. He was recording things that were available to everyone. However, they also, you know, terminated her under this dishonesty section of the code of conduct. Whereas when she was confronted about whether she was recording, she admitted it immediately. There's no indication that she hid it at all once asked. Whereas LK denied it and they decided to give him no discipline at all. So I think when you compare these two cases, you really see, you know, the male employee, when recording, received no discipline. Even though he was doing it openly in front of everyone, there were multiple reports that he was doing so. And then he lied about whether he was doing it. Now, the nursing employee, Ms. Magnolia, admitted it immediately. And, you know, they went forward from there. That was subject to, you know, immediate suspension, eventual termination. And I know that there is an issue of whether Ms. Magnolia was coached previously about recording. I would say, first, the actual coaching that's referenced was not about her recording. She has, it's undisputed that she has never recorded in the workplace before. This was in connection with LK? This was in connection with LK. Now, the actual cause for the coaching that she received was, she was upset about the employees sleeping in the workplace. She was perhaps rude during a meeting that they were holding about, you know, this whole incident. So that's what the coaching was for. During that coaching, her supervisor did mention, you know, we don't record in the workplace. But I think ultimately charter's position boils down to, if you have been told of a policy, that means that any subsequent violation of that policy is egregious. Which to me seems broadly overexpansive and not how, you know, any employer actually works. Because that would make any violation of the code of conduct provided to employees egregious. And that does not seem to be how their system works. It doesn't seem to be how any employer works. What do we do with the other four employees who were terminated for recording? I would say, first, that it's remarkable that charter relies on four corrective action reports over four years in a company with over 100,000 employees. That is just such a rounding error of incidents that I think it really just isn't prohibitive anyway. As to the merits of them, two of the employees were in California. And California is a two-party consent state. So that means that recording without another person's notice is actually a violation of law in that state. And, you know, one of those corrective action reports actually doesn't cite any charter policies. It says, you know, this is a violation of law and policy. Full stop. So that's two of them. They were actually engaging in what I understand to be criminal activity. Another one of those four, the individual was written up for harassing behavior towards other employees, including through recording and photographs, and for recording confidential charter information. Those facts aren't really relevant here. It's not necessarily that he was recording at all. I think it's likely that the real reason justifying termination in that situation was the recording charter confidential information. The fourth, admittedly, doesn't have these factors. But I would note that the corrective action report there does cite to the Code of Conduct for the reason for termination. And it is, in fact, an entirely different provision of the Code of Conduct. So it's not that this court needs to act as some kind of super HR department for charter. It's rather that based on how charter runs its business, the evidence that is provided, I think this court should recognize that there are at least genuine disputes of material fact that should have gone to a jury here. And I'd like to reserve my time. Thank you, Mayor. Thank you. May it please the Court, Celeste Creswell on behalf of the Appalachia Charter Communications. Your Honor, this case is not about failure to accommodate. It's about retaliation. This is a narrow appeal. The plaintiff has abandoned every claim on appeal with the exception of a single claim. That claim is retaliation. That claim concerns accommodations and not gender discrimination. And so we will talk a little bit about accommodations, but this is not a gender discrimination case. This case revolves on multiple independent dispositive holdings in the district court. This court does not need to decide any of what the appellant has termed issues of first impression with regard to statutory interpretation between WANMA and CAUTA. The district court can be affirmed on multiple bases. There's no promotation case. There's no causation. There's no pretext. There's no protected activity. This is under well-established law, McDonnell-Douglas and its progeny. It's not an issue of first impression. Could you speak to the pretext? Certainly. The first thing I'll say about pretext is it's important to recognize that it isn't charter's burden to disprove pretext. It is the plaintiff's burden to prove pretext. And so when we look at the evidence that the plaintiff has put forward on that issue, none of it suggests that Ms. Chapman had a discriminatory motive, that she was motivated to terminate Ms. Fagnolia for any reason other than what we articulated, which is that she recorded in violation of company policy. What policy particularly? Is there a recording policy or is it the ethical behavior policy? There is a policy against recording, whatever you call it, your honor. It's written in the newsletter that went to the HR employees. So that recognized there was a policy. The policy prohibits recording. It's also subsumed within the code of conduct, which requires ethical and professional conduct. And it's important to recognize that whatever you call the policy, the substance of the conduct that was disciplined has to be considered in the view of the good faith belief of the decision maker. And the decision here was Ms. Chapman. She was the director of the facility. She herself had taken lactation breaks and expressed breast milk at work. And she had offered her own private office to Ms. Fagnolia for her breaks. Well, what do we do about the email that she sent like a week or something, 10 days before the firing expressing what are we going to do about her or something along those lines? So what do we do with that email? I find it troubling. Your honor, that email does not suggest a retaliatory motive. It does not suggest that Ms. Chapman was looking for a reason to terminate Ms. Fagnolia. It suggests the opposite. She was looking for a reason to keep Ms. Fagnolia working, not to terminate her. She wanted and she expected that Ms. Fagnolia would continue to work at Charter consistent with Charter's policies, including the policy as to breaks beyond regular paid breaks when their lactation breaks being unpaid. So Ms. Chapman told Ms. Fagnolia, you can stack your paid breaks. You can stack them with your lunch. You can put them all together, use them any way that you want, and you can take as many breaks as you need. So what Ms. Chapman did was to say, here are all the ways that we want to keep you working. And the plaintiff has put forward no evidence that suggests the opposite, which is that Ms. Chapman was looking for a way to terminate Ms. Fagnolia and cover up her retaliatory intent. Was Chapman deposed? She was, your honor. And what was her recount, what she testified to? She was not only deposed, but she also submitted a declaration in support of our motion for summary judgment. And the facts as the pretext have not been challenged in either respect. What Ms. Chapman testified was that she honestly believed this was an egregious violation of what she understood to be a company policy prohibiting recording. So Ms. Chapman had been involved in a situation a year before. She was the director of the ROC. She was involved in the situation when LK indicated to someone, someone reported that LK said either I've recorded or I'm going to record or something about potentially recording another employee out in the open where everyone could see it. So the reaction to that was to coach the entire team, including LK, on an individual basis. You shouldn't do that. The reaction was to also coach Ms. Fagnolia on an individual one-to-one basis. And the documented notes from that coaching, the first two bullet points, bullet point one, discussed employees recording other that everyone involved believes honestly and in good faith that there was a prohibition on recording other employees at charter. There's also nothing to dispute Ms. Chapman's testimony that she believed and understood and knew that Ms. Fagnolia had been coached as to should not be recording other employees at work. Don't do that. There's nothing the plaintiff has put forward to dispute that Ms. Chapman actually based her decision to terminate on the recording and not on anything else. So she was not aware of any complaints about locations being private or sanitary. As far as she knew, Ms. Fagnolia was satisfied with all of that, including when Ms. Chapman offered her own private office that was empty at night on the shift that Ms. Fagnolia worked, and she could have locked the door. So there's nothing to suggest, Your Honor, that in Ms. Chapman's testimony that she didn't hold an honest and good faith belief that there was a policy and that Ms. Fagnolia had been coached as to that policy and was aware of it, and then that Ms. Fagnolia chose to intentionally violate that policy by secretly recording a private closed door meeting that was, in Ms. Chapman's honest view, more egregious than what happened with Elkay and was sufficiently egregious to warrant termination, just as four other employees, which we submitted the corrective action reports for, demonstrate this is a real policy and it's really enforced and people really get terminated for recording at work, even if it's the first time. But the corrective action reports, I guess I have two questions. One is how should we be thinking about those in evaluating pretext? We're writing the opinion. What are we saying about the corrective action reports? You should be thinking about first that that's our evidence that we put in and we don't have the burden to disprove pretext and the plaintiff, Ms. Fagnolia, can't carry the burden to prove pretext by attacking or trying to poke holes in our evidence just to bring forward her own affirmative evidence that's something more than conjecture or speculation. So we don't have to litigate and prove that it was wise or perfect to terminate any of these employees. We just have to show that Ms. Fagnolia cannot prove and she hasn't done that. Well, don't we have case law that says that discrediting a proffered reason is a legitimate way to show pretext? Don't we have some 10th Circuit law saying that? Yes, Your Honor. So when you're saying you have to do more than just poke holes in her statements, it could be, depending on how big the holes are, that that would be sufficient, wouldn't it? It could be if what they were poking holes in was something different. So they aren't poking holes in the articulated reason. They are trying to poke holes in our proof that suggests there was no pretext and those are two different things. They aren't attacking Ms. Chapman's good faith belief that this was her real reason for terminating Ms. Fagnolia. I'll make one other comment about the corrective action reports. The appellant has criticized that there are only four of them and it's a big company. And appellant's counsel was not involved in the case below, but had they been, they would know that in discovery it was limited to a geographic scope. So it was limited to the region in which Ms. Fagnolia worked. So that's one reason that criticism fails. The second reason that criticism fails is we wouldn't expect people in a professional work environment to go around recording each other. And that we found four instances and in each one of the four instances that we found within a limited time period, within a limited geographic area, all resulted in termination, really proves the opposite of pretext. But don't they have to be similarly situated? I seem to have recording as part of their origin story, but a lot more. They seem quite different from Ms. Fagnolia. Why am I thinking about that wrong? Because it is not charter's burden to prove that these are sufficiently situated, similarly situated people for comparative purposes. That's plaintiff's burden. The plaintiff has to prove, has to find somebody who is similarly situated and prove they were treated differently. And the plaintiff hasn't done that. So from our perspective, these four corrective action reports, and one of them, you know, the plaintiff has made no attempt to differentiate. It's on all four. So there aren't any additional circumstances that would make it not similarly situated. So for both reasons, we don't have the burden is one. And two, there's at least one of the four that's exactly on point and suggests there wasn't a pretext. I want to make a couple of comments about causation. There is no evidence that the plaintiff has provided that is sufficient to overcome this court's precedent on intervening cause as to causation. So temporal proximity alone isn't enough to carry the burden of establishing a prime official case where there is an intervening cause. This temporal proximity is pretty proximate, wouldn't you say? It is in the sense that she was only back at work for a short period of time. But when there is an intervening cause, as there was here, it's not enough. And we would point the court to a similar case in that regard, two similar cases in that regard. One is the Diamond case. The employee there made a complaint very close to the time the employee was terminated. But there was an intervening cause and it was a violation of company policy. And because there was an intervening cause, the court affirmed and said there's no showing of causation, so there's no prime official case. Which case is that? The Diamond case. And I'll mention a couple of other cases. I have a short amount of time left, so I just want to touch on two other decisions. One is the Kendrick case. And the standard in Kendrick suggests that what the plaintiff would have to show in order to win in this case is that no one else who secretly recorded after being coached would have been fired. And that's what I have been talking about for most of my time. The other case that I would like to mention is the Lobato case. And there the court held that there was no pretext because there was evidence of the employer imposing similar disciplinary sanctions on other employees. And again, we have that in this case. But the intervening event just tends to undermine, right? That's the language. It doesn't destroy the causation, right? It's just something we would consider. It's not automatic. I don't believe it's automatic, Your Honor. But in all of the cases that I've seen where intervening cause comes up, the intervening cause is held to be so disruptive of any probative value of temporal proximity that it does destroy any inference of a retaliatory motive. And that, at the end of the day, is what this case turns on. Has the plaintiff provided any evidence that would suggest that Ms. Chapman chose to terminate her because she requested accommodations or she objected to something? Or does all of the evidence demonstrate that Ms. Chapman honestly believed there was a policy, that Ms. Spagnolia violated it, and that the violation was egregious enough that it warranted termination? Thank you, Counselor. Your time has expired. Mr. Shaw, you have some rebuttal time remaining. Thank you, Your Honors. I'd like to pick up where Judge Ebell went, noting that this court has held recently, in fact, as recently as 2022, in Stroop v. United Airlines, that a plaintiff can establish pretext based on weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the stated legitimate non-discrimination, non-discriminatory reason. Similarly, in 2010, in Jones v. Oklahoma City Public Schools, this court rejected a pretext plus standard under McDonnell Douglas unless the Reeves exception applied, which would not be relevant, which would not apply here. Essentially what my pretext is, we have to prove that Ms. Chapman had a discriminatory motive, and that was the reason why she terminated Ms. Spagnolia. That's been rejected by this court's case law under McDonnell Douglas and pretext for as much as 12 years. I'd also like to note, returning to what my the four additional corrective action reports, it's true that those show that some individuals have been terminated for circumstances that involve recording, as Judge Rossman noted. May involve other issues, but do involve recording. However, we have the numerator, we do not have the denominator. We know that at least four people were terminated for recording in the workplace of Ms. Spagnolia during these four years. We don't know how many people were not terminated. For instance, LK is not represented in these corrective action reports, because there was no corrective action report. I'd like to point back at Stroop again, which ultimately found that the policy violations that the plaintiffs were accused of violating, that there was at least a genuine dispute of material fact, whether they were commonplace or minor, such that a jury could find that they were not so severe as to warrant termination. This seems like a very similar case. In LK's case, the charter decided not to terminate because it was not that serious, there wasn't enough proof. It's an unclear policy about reporting, in Ms. Spagnolia's case, it decided to terminate her based on her first instance of actually committing this misconduct. I think that that really sets the stage for the pretext claim. With that in mind, we would ask either for this court to certify the statutory question to the Colorado Supreme Court so that that court can resolve the question of state law, or in the in the case will be submitted.